DBJ7ROPS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                        11 Cr. 176 (CM)

 5   JASON ROPER,

 6                Defendant.

 7   ------------------------------x

 8                                    November 19, 2013
                                      5:00 p.m.
 9

10   Before:

11                    HON. COLLEEN MCMAHON
                                      District Judge
12

13                         APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  ANDREW BAUER
16        Assistant United States Attorney

17   JAMES NEUMAN
          Attorney for Defendant
18

19

20

21

22

23

24

25
```

DBJ7ROPS

1              (Case called)

2              (In open court)

3              MR. BAUER:  Good afternoon.  Andrew Bauer for the

4    government.

5              MR. NEUMAN:  Good afternoon.  James Newman for Jason

6    Roper.

7              THE COURT:  Have a seat everyone.

8              This matter is on for sentence under docket number S1

9    11 Crim. 176-01, United States of America v. Jason Roper,

10   Mr. Roper having been found guilty of one count of conspiracy

11   to distribute and possess with intent to distribute marijuana

12   and crack, a class A felony in violation of 21 United States

13   Code, Section 846 and 841 (b)(1)(A).  This crime carries a

14   mandatory minimum term of ten years and a statutory maximum of

15   life imprisonment; a mandatory minimum of five years and a

16   statutory maximum of lifetime supervised release; a maximum

17   fine of $4 million; and a $100 special assessment;

18             One count of use of a firearm in furtherance of a

19   crime of violence, in violation of 18 United States Code,

20   Sections 924(c)(1)(A)(iii) and 2.  This is also a class A

21   felony, and it carries a mandatory minimum sentence of seven

22   years, to run consecutive to any other sentence, with a maximum

23   term of life imprisonment; a maximum of five years' supervised

24   release; a maximum fine of $250,000; and a mandatory $100

25   special assessment;

DBJ7ROPS

1          One count of conspiracy to commit a Hobbs Act robbery,

2     in violation of 18 United States Code, Section 1951, a class C

3     felony, carrying a maximum 20 year term of imprisonment; three

4     years supervised release; a fine of the greater of $250,000, or

5     twice the gross gain to the defendant or loss to identifiable

6     victims other than the defendant; and a $100 special

7     assessment;

8          A second count of the same crime, a class A felony

9     carrying a second count, a mandatory minimum of 25 years'

10    imprisonment, to run consecutive to any other sentence; with a

11    maximum term of lifetime imprisonment; the same five year

12    supervised release; $250,000, or twice the gross gain or loss

13    fine; and a $100 special assessment;

14         Two counts of robbery, class C felonies, in violation

15    of 18 United States Code, Sections 1951 and 2, carrying each a

16    maximum of 20 years' imprisonment; three years' supervised

17    release; the same maximum fine of $250,000, or twice the gross

18    gain or loss on each count; and a mandatory $100 assessment on

19    each count;

20         And, finally, one count of robbery of a confidential

21    informant -- which I never knew was its own crime.  That's a

22    first for me -- in violation of 18 United States Code, Section

23    111(a) and (b).  I assume it's a Class C felony.  It carries a

24    maximum potential penalty of 20 years' imprisonment; three

25    years' supervised release; the maximum fine the greater of

DBJ7ROPS

1    $250,000, or twice the gross gain or loss; and a mandatory $100

2    special assessment.  That's $700 in special assessments.

3           In connection with today's proceedings, I have

4    received and reviewed the presentence report prepared by United

5    States Probation Officer Lydia Ramos dated November 13, 2003.

6    I have a sentencing submission from the government dated

7    November 1, 2003.

8           Where is the other one, Jim?

9           Mr. Neuman, I am told that you submitted something in

10   writing.

11          MR. NEUMAN:  I have a copy if you would like, Judge.

12          THE COURT:  If possibly you could give it to me --

13          MR. NEUMAN:  Yes.

14          THE COURT:  -- because we're not able to locate it.

15   though I rather imagine you are going to be saying most of

16   these things to me in any event.

17          MR. NEUMAN:  Yes.

18          THE COURT:  Just give me a minute.

19          I have previously seen the so-called Bauer letter.

20   That was in the file.  What it was attached to was not, but

21   that letter was in the file.

22          OK.  All right.  Has the government reviewed the

23   presentence record?

24          MR. BAUER:  I have, your Honor.

25          THE COURT:  Is there anything else I should have seen

DBJ7ROPS

1   in writing from the government prior to today other than your

2   5K letter?

3           MR. BAUER:  No, your Honor, although I will note that

4   I attached a letter to my 5K.

5           THE COURT:  Yes, there was a letter attached to your

6   5K.

7           MR. BAUER:  That's it.

8           THE COURT:  OK.  And has the government reviewed the

9   presentence report.

10           MR. BAUER:  Yes, your Honor.

11           THE COURT:  Any additions, deletions or corrections?

12           MR. BAUER:  No, your Honor.  I will note that I did

13   look at the guidelines calculation.  It is a little complicated

14   but it looked correct to me.

15           THE COURT:  OK.  And does the government make the

16   motion contemplated by its letter?

17           MR. BAUER:  Yes, your Honor.

18           THE COURT:  All right.  Then I will hear you.

19           MR. BAUER:  Thank you, your Honor.  I will begin with

20   the crime that you didn't know was a crime, which is the

21   robbery of an informant.  That was the instant crime that

22   Mr. Roper was arrested upon.  All of the other charges were

23   learned at least for the most part during the proffers.  So, he

24   got arrested for using what turned out to be a BB gun to arrest

25   what turned out to be a DEA agent or an informant, and based on

DBJ7ROPS

1   that charge he came in and began proffering.

2          Almost instantly he accepted responsibility and at

3   that very first proffer told us about a significant information

4   in terms of historical information that a proffer can give you.

5   He talked about five different murders, murders that he either

6   witnessed firsthand, or murders that he heard about from the

7   people who did the murders.  It was based on that

8   information -- and actually it was Ms. Heller who was sitting

9   before you for the last eight hours who proffered Mr. Roper

10  that day.  She called me because I was doing the Yonkers gang

11  initiative investigation, and we sat down with Mr. Roper.

12         Now, at that point we had begun to collect information

13  about Mr. Roper, but he quickly filled in all of the gaps and

14  provided significant information about his own criminal

15  history, as well as that of many other people.  I think what I

16  would like to stress about the historical information that he

17  provided, which was significant -- and I tried to say this in

18  the 5K letter -- was Mr. Roper is liked or accepted by many

19  different groups in Yonkers.  There are factions, there are

20  fault lines between all the different gangs in Yonkers.  I know

21  you are most familiar with Newburgh, but it's not so dissimilar

22  to Yonkers.

23         THE COURT:  I have some not immodest familiarity with

24  Yonkers, if only because I spent nine years sitting in White

25  Plains.

DBJ7ROPS

1          MR. BAUER:  Exactly.

2          THE COURT:  But there are other reasons why I am

3     familiar with Yonkers.

4          MR. BAUER:  Fair enough.  Well, Mr. Roper was able to

5     hang out, sell drugs, borrow guns from the Elm Street Wolves,

6     the Cook Street Gangsters, the Two Guns Up crew from Riverdale

7     Avenue.  That was his main crew.  Those were all on one side of

8     the aisle there in Yonkers.  He was also accepted by the Strip

9     Boys, the main rival to those gangs, and was able to go down to

10    the Schlobohm housing project in southwest Yonkers and hang out

11    there and sell drugs there.  That is a rare thing in Yonkers.

12    Because of that, he instantly provided value in a variety of

13    different angles from which our investigation moved.

14          So, in August 2011 -- which was five days after his

15    guilty plea here in this courtroom -- we took down 65 members

16    of the Elm Street Wolves, and the Cliff Street Gangsters.

17    Mr. Roper's information contributed significantly to that.

18          The next year, June 2012, we took down another 23

19    members of the Strip Boys.  His information was incredibly

20    significant for that as well.

21          And then I have news, your Honor, that's hot off the

22    presses, meaning it didn't make it into my 5K letter, but on

23    November 6, so less than two weeks ago, we did another

24    take-down in Yonkers.  We did a take-down of the Two Guns Up

25    crew -- that's Mr. Roper's crew -- and obviously we relied

DBJ7ROPS

1    heavily on his historical information there.  So, it's another

2    11 defendants that we arrested just a couple of weeks ago.

3          Mr. Roper's cooperation is expected to be ongoing.  He

4    specifically requested that I ask you to make it a term of any

5    supervised release that his cooperation be ongoing.  So, even

6    though I am sure he is sitting there hoping for time served

7    right now, even if you were to give him that, the government --

8    that includes me and all the agents -- have no doubt that Mr.

9    Roper will be available to us as that Riverdale Two Guns Up

10   case continues.

11         I would say, your Honor -- I mean I wrote a pretty

12   detailed 5K letter.  I would be happy to answer questions that

13   you have for me -- but I would say that Mr. Roper was a major

14   success as a cooperator in two important ways.  Number one --

15         THE COURT:  Could I speak to Mr. O'Neil for one

16   second?

17         MR. BAUER:  Sure.

18         THE COURT:  OK.  Keep going.

19         MR. BAUER:  He was a major success.  What I mean by

20   that is obviously cooperators can be successful if they testify

21   and help get a conviction.  Mr. Roper didn't have that

22   opportunity.  He was incredibly successful though first in the

23   sheer volume, quantity of information that he provided, it's

24   the very nature of the substantial assistance that we look for.

25   Hopefully that message has come across to you to your Honor.

DBJ7ROPS

1   But the other reason he is a success is what he has been saying

2   to me for the last two years, which is that he has turned his

3   life around, his commitment to leaving the street life.  I know

4   that you hear that all the time; we hear that all the time.

5            THE COURT:  All the time.

6            MR. BAUER:  We hear that all the time.  I can only

7   tell you from my experience, and that is it had to be more than

8   just contrived for my benefit and for your benefit here today.

9            He has been consistent.  He has called me.  I yell at

10  him.  He gets my phone number, and he has called me to talk

11  about his job opportunities and his schooling.  There is such a

12  genuine interest in him to move his life forward, and that's

13  the reason why I attached his letter to me.  Again, I yelled at

14  him for writing me that letter, because as we tell every

15  cooperator, you are creating 3500 if you write me a letter.

16           But I guess my message to you is at least I believe

17  it.  I think it's more than just lip service that a defendant

18  being sentenced tells you, or in this case would tell me, just

19  the consistency and the duration of the message.

20           So, I think that's kind of a success.  I don't want to

21  make the process of cooperation more than it is, but I guess I

22  will admit that I do hope that when we sit there with somebody

23  who was committed to a life of crime that he was for so long,

24  that he would see the value in turning his life around.  Not

25  every cooperator does.  But I think Mr. Roper did and has since

DBJ7ROPS

1      the outset.

2              And I just offer it to you, your Honor, because I know

3      you hear it from that table all the time.  And I can't promise

4      you anything about what Mr. Roper is going to do.  I am just

5      giving you my impressions.  Because I think it's important, and

6      I haven't -- I mean I can't tell you -- I can tell you, there

7      are 14 Yonkers cooperators, some of whom have been sentenced,

8      and I don't stand up here and say that for everybody.

9              So, I am happy to answer any other questions that you

10     have.  Obviously, Judge, I don't want to sit down without at

11     least underscoring the serious nature of his offense conduct.

12             THE COURT:  Yikes.

13             MR. BAUER:  It's impressive in its breadth.

14             THE COURT:  Indeed.

15             MR. BAUER:  And in fact it's not just selling drugs.

16     It was the robberies.  And I think to bring it back to how he

17     first came to the robbery of the CI, the DEA CI, it's obviously

18     because he was living a life of robberies.  And obviously it's

19     incredibly serious conduct, and it's one that I described in

20     some length in the five K letter.  So with that, I will offer

21     myself for any questions that you may have.  Otherwise, I will

22     defer to Mr. Neuman and Mr. Roper.

23             THE COURT:  OK.

24             MR. BAUER:  Thank you.

25             THE COURT:  Mr. Neuman, have you reviewed -- first of

DBJ7ROPS

1    all, is there anything else I should see in writing from you?

2    There are some letters from the family, I saw.

3             MR. NEUMAN:  That's it.

4             THE COURT:  I went right to them.  I figured you would

5    say everything else, and so I went to them.

6             MR. NEUMAN:  Yes, Judge, that was a good decision.

7    That's all I have submitted in writing.

8             THE COURT:  OK, fine.  And have you reviewed the

9    presentence report and gone over it with Mr. Roper?

10            MR. NEUMAN:  Yes, I have, and we do not have any

11   objections.

12            THE COURT:  OK.  So, make your pitch.  You can assume

13   that I am going to grant the government's motion.  OK?  Let's

14   assume that.

15            MR. NEUMAN:  Judge, there are many people for whom I

16   appear on behalf at sentencing, and this process by rote is

17   easy, the factors are black and white, and occasionally I have

18   someone like Mr. Roper where I struggle a little bit to put it

19   into words because I'm trying to convey something a little bit

20   more emotional that I have witnessed; and to some degree this

21   is what Mr. Bauer has already said, but I will try not to be

22   too repetitive.

23            THE COURT:  That's OK.

24            MR. NEUMAN:  When I first met Mr. Roper, and I saw the

25   charges he was presented with, I thought, well, I had somewhat

DBJ7ROPS

1    the same reaction you did, it sounded like a very legal theory,

2    I was excited maybe I could come up with something here, a new

3    legal issue.  And he explained to me how it was really a BB gun

4    too, which we hadn't verified.  I was not pushing him in any

5    direction.

6            And, you know, he immediately -- I think it was really

7    immediately -- said that he wanted to cooperate.  And then the

8    conversation went on, and as I spent some time with him, I

9    explained to him all the additional crimes that he would be

10   admitting to, that as far as we knew the government knew

11   nothing about.  And that shook him a little bit.  He was

12   certainly not -- you know, he didn't just listen to it

13   blithely.  But he listened to it, and he decided that he was

14   going to take what I would call a leap of faith in me, what I

15   was advising him to do, a leap of faith in the government and

16   the whole system.

17           And when he made that decision, to me it's really a

18   life changing decision, not just because there are all the

19   additional charges he was admitting to, but because of the

20   scope and the breadth of the number of people that he was going

21   to have information on and inform about.  Because it was really

22   a major break with a lifetime of associates, and that's not an

23   easy thing to do, but he did that.

24           What I learned about him in the next few years is that

25   he was not cooperating solely to reduce his sentence; he was

DBJ7ROPS

really doing it because he generally wanted to turn his life

around.  And I agree with Mr. Bauer, we hear this all the time

from people, but there is evidence here that makes it real to

me.

You have seen the letters from the family members.

They talk about how he has been asking them to help him find

colleges and jobs and things like that.  He has talked to me

about Monroe College in particular which is in New Rochelle,

and how he thinks he can get financial assistance.  There are

concrete plans that are being made.  And Mr. Bauer has talked

about how he badgered him.  Well, he badgered me too.  And I

say that, I mean that in a loving way.  Really the worst thing

I can say about Mr. Roper is he has been a real nudge in terms

of calling and asking about things, but never to complain about

what is going on in the case, but just because he wants to put

his life together.

So, I have heard many, many conversations about what

he is going to do when he gets out.  And this goes back to the

beginning.  He knew this was going to be a very long process

because of how much knowledge he had.

Now, as the result of the scope of his knowledge, I

think it is important to say that he really faces I think risks

and danger above and beyond what many cooperators do, because

there are so many different types of groups involved.  Last

week at the MCC he was assaulted by someone else, I think his

DBJ7ROPS

1    name is D, I've forgotten the last name.

2              THE COURT:  I have it.

3              MR. NEUMAN:  You have it.  But I know there was a

4    separation, and no one is blaming anybody.  Things happen, but

5    this was an explicit retaliation for his act as a cooperator.

6    And I mention it to you because I think it underscores that

7    when you are in a federal jail, no matter what the precautions,

8    there is danger, and no matter how well intentioned everyone is

9    at preventing the danger.  I think he faces more danger than

10   most people.

11             Now, while he was at the MCC he also got a GED; he

12   completed two drug programs.  So, this is more concrete

13   evidence that he really is making an attempt to be productive.

14             I have also argued in my submission that I think that

15   while he does have an extensive criminal history, a lot of that

16   I believe can be attributed to conditions that no longer exist.

17             He grew up in difficult circumstances.  His father was

18   in and out of prison, was a heroin addict.  Mr. Roper was

19   diagnosed with ADD and some learning disabilities, was on

20   medication for a while which helped the behavior, but then he

21   was taken off the medication, the behavior worsened.  He

22   developed a daily drug and alcohol habit by the time he was 16

23   years old.  And at this point he has completed programs, he is

24   a more mature person, and I think there is much less of a risk

25   that he is ever going to commit a crime again.

DBJ7ROPS

1          The other factor that I think is important is that he

2     has a real history of employment.  Even while he was committing

3     crimes and under a daily drug habit, he worked in a variety of

4     jobs.  He worked at places like K-Mart, Stop N Shop, YMCA,

5     Nordstrom's.  And I have spoken to the manager at Nordstrom's

6     personally, and she cannot be here today.  I have her phone

7     number, and she is willing to be called.  I made available the

8     probation officer who did not see fit to call --

9          THE COURT:  I understand.  She may find herself up

10    against other things, but I understand that she wants to give

11    him a job.

12         MR. NEUMAN:  She wants to give him a job.  And the way

13    she put it to me is that they were eager to have him back.  You

14    know, she knows what the case is about, but she knows him, and

15    she knows that he's a very good worker.  And another factor --

16    which I think is hard to convey adequately -- is that Mr. Roper

17    is really a nice person.  By that I mean he is affable, he is

18    pleasant, people want to help him.  We're all rooting for him

19    here, whatever the sentence is.  He is a terrific family

20    member.  His mother and his sisters are here today.  His other

21    sister could not be here, and his five year old son wanted to

22    be here but is sick today.  He talks to me frequently about how

23    he wants to cultivate that relationship.  They see each other

24    on a weekly basis.  And the letters show me that Mr. Roper is

25    very important to his family.

DBJ7ROPS

1          Probation has recommended a sentence of 60 months.  He

2     has done virtually three years.  I think that taking all of the

3     factors into consideration, I think that a sentence of time

4     served would be more than adequate and would be just.

5          THE COURT:  Do you have anything you want to say to

6     me, Mr. Roper?

7          THE DEFENDANT:  Yes.  Your Honor, before I start I

8     just want to say that everything I'm about to say you might

9     have heard a thousand times, someone is back with a new story

10     on a later date.  Not my case.

11          My situation is very different, and everything I say

12     is coming from my heart, and I hope that you can believe me

13     enough to know that I have changed, and over the last three

14     years I have become a more and responsible man with strong

15     morals and plans for better my future.

16          The last time I was in your courtroom was on August 4,

17     2011.  On that day I pled guilty to a seven count superseding

18     information.  That pushed the number of years that I was facing

19     up a lot.  Since then, Mr. Bauer, Mr. Neuman and I have came

20     such a long way down my road towards recovery.

21          First, I want to thank you, your Honor, for responding

22     to my letter and showing me that I was in good hands.  Also, I

23     want to thank Mr. Bauer and my lawyer for believing in me and

24     giving me a chance to change my life around, as well as giving

25     me a chance to right my wrongs.

DBJ7ROPS

1          Your Honor, with respect to your courtroom, I would

2    like the record to show that I take full responsibility for my

3    actions in breaking society's laws, and I am truly sorry for

4    all of the families that may have been affected by my

5    wrongdoing.

6          In light of the fact that my crimes are violent, I

7    want you to know that no one was ever hurt physically.  Also,

8    your Honor, my decision to cooperate played a big part because

9    of my five year old son, Jason Roper, who means the world to

10   me.  I am still active in his life.  I don't want him to grow

11   up with a father, take to the streets and turn out like the old

12   me.

13         I let my loved ones down.  Being that I was locked

14   away for three years and not in his life on a day to day basis,

15   it hurts so bad when he asks me when am I coming home because

16   he wants to watch a movie with me, or he wants to bake a cake

17   for me.

18         Your Honor, not only to myself but to my family I made

19   a promise never to commit another crime and come back to this

20   place and not be a part of their life.

21         Again, being locked up for so long opened my eyes to

22   so many things.  First, just knowing that I don't have any two

23   things and my family is all I have.  Your Honor, with respect

24   to your courtroom and you, I would like to thank my mother, my

25   son and my sister for showing me so much love and support, just

DBJ7ROPS

knowing that somebody is waiting for me to come home and who
cares about my well being.  When I do get out of this place, I
am going to try my hardest to make up for lost times and make
newfound memories as I progress.

        With that said, I would like to tell you my plans for
when I get out of here.  First, my older sister pulled a few
strings to get me my old job become at Nordstrom's cafe, where
I plan to work as many hours as the manager permits me to.

        Second, since I have been at the MCC I have worked
hard to earn my GED, and once I received a copy of my passing
score, thoughts of going back to school and furthering my
education, has never made me happier to want to attend school
and try to get my Associates Degree and go on for another two
years in hopes of getting a Bachelor's degree in applied
science and culinary arts field.

        After having my sister and the drug facility counselor
look up numerous schools, I feel like Monroe College is more
convenient to where I work and live, and I strive to some day
be the head chef for somebody's kitchen and maybe even my own
restaurant.

        I know that nothing happens overnight, but with hard
work and dedication, and with support from my family, I know
that I can achieve my goals and try to help as many people as
possible and direct their lives down the right paths.

        Finally, your Honor, I pray that you believe I deserve

DBJ7ROPS

1      a second chance and not only live in this society but being a

2      role model and to my son and to others.

3              Thank you for giving me a chance to express my

4      feelings before your Honor.

5              THE COURT:  Have a seat.  Well, I do grant the

6      government's motion.  I can without exaggeration characterize

7      your cooperation as truly extraordinary.  So, the only question

8      is how much time.

9              There are times when I wish that I was sitting at the

10     Northern District of Illinois, because in the Northern District

11     of Illinois they have a policy that they abide by.  Everybody

12     gets, and you know in advance you are going to get a certain

13     percentage, it's always the same percentage no matter who the

14     defendant is.  If you get the 5K letter, the most you can get

15     off is a certain percentage of your time, and it takes the

16     guesswork out of it for the judge.  And it reflects a policy in

17     favor of substantial punishment for cooperators.  They get a

18     break but they don't get the kinds of sentences that we so

19     frequently give in this District.

20              You have an extraordinary record, and you have an

21     extraordinary panoply of charges to which you have pleaded

22     guilty. I appreciate that the government would not have been

23     able to lodge all of these charges against you without either

24     you or someone else telling them about all of these things.

25     The fact that you are the one who told them is definitely in

DBJ7ROPS

1    your favor.

2            You're right, I have heard it all before.  I have.  I

3    have heard it most recently in a 65 defendant case involving

4    gangs in Newburgh.  I have had Yonkers gang cases.  I have had

5    gang cases in Mt. Vernon.  I have had gang cases pretty much

6    everywhere.  And, yes, I hear it all the time, and all the time

7    I am disappointed.  Every time any act of generosity or mercy

8    has a tendency to get thrown then back in my face.  Certainly

9    in the Newburgh case -- which is my most recent case -- I have

10   become accustomed to coming into the courthouse once a week and

11   seeing that somebody who got a reduced sentence for some reason

12   or other, and who told me that he had turned his life around

13   and seen the light, and he was on the straight and narrow, is

14   back for a violation of supervised release.  So, I have become

15   somewhat cynical when people stand up and tell me what you have

16   so eloquently and so beautifully, and so fulsomely told me.  I

17   have become a believer that actions speak louder than words,

18   and altogether too often the actions don't measure up to the

19   flowery promises.

20           The government has given you an extraordinary

21   testimonial.  I rarely hear an assistant United States attorney

22   openly plead for a vast reduction in sentence and argue the

23   possibility of time served.  It almost never happens.  And I

24   can understand why, because the value of the cooperation that

25   you have given and continue to give is at tremendous risk to

DBJ7ROPS

1    yourself.

2            I accept that you have diligently made plans for when

3    you get out, and they include being a good father to your son,

4    which apparently you have continued to be even while

5    incarcerated, which counts for a lot with me, because I'm tired

6    of seeing children abandoned by their parents and especially by

7    their fathers.  I'm sick of it.

8            And you lined up a job and you have plans for school.

9    Let me ask you a question, Mr. Roper, what happens if things

10   fall apart?  What happens if the people in the personnel

11   department at Nordstrom's tell the manager that notwithstanding

12   what she wants to do, they're not going to let you come back

13   because of these substantial convictions?  What happens if you

14   have a hard time finding a school that will take you?  You are

15   going to drag that record around like a very, very long tail on

16   a dog.  What are you going to do?  What are you going to do

17   when you run into a roadblock and your beautiful plan?

18           THE DEFENDANT:  Your Honor, under no circumstances

19   will I go back to my old life.  I'm not going to lose hope, and

20   I know that eventually if things don't go as planned, then

21   there is something out there for me.

22           I know I also have looked up other programs to help

23   felons get jobs, people with bad records.  I also have been

24   told that I can look in the Department of Construction, but I

25   don't know how good would that be.  I know that I'm not going

DBJ7ROPS

1    to go back to my old life.  I know that I'm not going to commit

2    any crimes.  I know the easiest way for me to get money is for

3    me to rob somebody, and I am never -- I am never going to rob

4    nobody again.  I'm never going to do anything that's going to

5    land me back in front of you, not even a violation.

6              I am sorry that so many other people have let you

7    down, but then again I don't know if their situation was as

8    mine was, but I have no plans for failure for the future.  And

9    to my understanding, I know that the schools accept people.  I

10   know that there are people out there to help people like me in

11   the situation that I am in.  And I know I have a bad record,

12   but I --

13             THE COURT:  You have a terrible record.

14             THE DEFENDANT:  No, I'm talking about my criminal

15   history.  I am not talking about the charges I had copped out

16   to.  I don't have any felonies -- well, prior to this case I

17   didn't have any felonies; I had just like minor misdemeanors.

18   But I can tell you personally that if you see me again, it will

19   probably be to get off of probation early or something in that

20   nature, because I don't plan on reoffending, your Honor.

21             THE COURT:  Well, hope springs eternal, Mr. Roper, so

22   I'm going to give you the benefit of the doubt, and I'm going

23   to let you give it a try.

24             I'm going to send you home.  But, Mr. Roper, if you

25   break my heart, if you disappoint me, if they bring you back to

DBJ7ROPS

1    me, don't count on getting anything less than the maximum I can

2    give you no matter how infinitesimal the violation, because I

3    have warned you, I have told you straight, I'm tired of being

4    disappointed.

5              THE DEFENDANT:  I'm not coming back, your Honor.

6              THE COURT:  If you can overcome this, if you can make

7    a go of it on the outside without going back to the street,

8    more power to you; I will be so happy.  I am looking at your

9    mother, who does not deserve what she has undoubtedly gone

10   through.  And I am a mother, and I will tell you that you owe

11   her a lot.  You have a lot to make up for, and you better do

12   it, because not only will I be angry as a judge, but I will be

13   angry as a mother if you show up back here again.

14             I have reviewed the presentence report.  I accept and

15   adopt as my finding the description of the offense and the

16   offense conduct and the calculation of the guidelines which I

17   agree to be correct.

18             It is obviously a very complicated guideline

19   computation.  The total offense level is 30 and the defendant's

20   criminal history category is hard to find.

21             MR. BAUER:  Paragraph 97.

22             THE COURT:  It's Criminal History Category IV.  Seven

23   criminal history points.

24             I accept and adopt as my findings probation's report

25   about Mr. Roper as out beginning at the paragraph 101 of the

DBJ7ROPS

presentence report.

I grant the government's motion pursuant to Section 5K1.1, and I will sentence the defendant without regard to the mandatory minimum sentences that are otherwise applicable to him.

I appreciate the good work done by probation officer Ramos, and I was initially inclined to take her recommendation. In the end I'm going to take the chance on Mr. Roper that's even greater than the chance that probation officer Ramos has given, partly because what she recommends -- which is a five year sentence -- is not significantly longer than the sentence he has already had.  He has essentially done a three year sentence already.

Sir, will you stand.  Under docket number S1 Cr. 176-01, this is a downward departure sentence by virtue of the defendant's substantial cooperation, which has been truly extraordinary and has proven a plethora of results.

I hereby sentence you on each of Counts One through Seven to time served, to be followed by a period of five years' supervised release on Count One, Two and Four; and three years' supervised release on Counts Three, Five, Six and Seven, which makes for a term of five years' supervised release.

Defendant has no ability to pay a fine.  He does have to pay a $700 special assessments, which is due and payable immediately.

DBJ7ROPS

1          OK.  So, for the next five years, Mr. Roper, you are

2    under my thumb.  You will report to a United States probation

3    office this week.  By Friday you have to have reported to a

4    United States probation office.  Mr. Neuman will tell you where

5    to go.  You are going to be assigned a probation officer.  You

6    are going to meet with that probation officer on a regular

7    basis.  You can't miss a meeting.  You are going to do

8    everything that probation officer tells you to do.  If the

9    probation officer tells you not to do something, you can't do

10   it, no questions asked, you simply obey.  Do you understand?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Let me tell you what the general rules

13   are:

14             You cannot commit another crime.  There is no margin

15   for error.  Don't jay walk.  It doesn't matter if the crime is

16   serious or is a misdemeanor or violation.  It doesn't matter if

17   the crime is federal, state or local.  It doesn't matter, you

18   cannot commit another crime.

19             You cannot illegally possess a controlled substance.

20   If you have drugs on your person, you had better have gotten

21   them from a licensed pharmacist at a drug store like, you know,

22   the Walgreen's or the CVS, pursuant to a prescription from a

23   doctor.

24             You have to participate in a program approved by the

25   United States probation office, and that program will include

DBJ7ROPS

1    testing to determine whether you have reverted to using

2    controlled substances.  I authorize the release of available

3    drug treatment evaluations and reports to the substance abuse

4    treatment provider as approved by your probation officer.

5           You have to contribute to the cost of services

6    rendered in an amount to be determined by your probation

7    officer, based on your ability to pay or the availability of

8    third-party payment.  And you also have to participate in an

9    alcohol aftercare program, again under a copayment plan if

10   possible, and that will include testing by a Breathalyzer at

11   the discretion and direction of your probation officer.

12          You have to give your probation officer a sample of

13   DNA, genetic identifying material, which will be put into

14   criminal databases so that you will be more easily traceable in

15   the future.

16          You have to obtain and maintain legitimate and

17   verifiable employment.  I hope that if I show up at Nordstrom's

18   in White Plains at the mall that you are at the coffee shop.

19   But if that doesn't work out, you have to find another job or

20   go to school.  That wouldn't be such a bad thing for you to do.

21   Do both.  Keep you busy and off the street.

22          You cannot associate with people who been convicted of

23   crimes, and you cannot be found in places where criminal

24   activity is being planned or carried out.  You can't have any

25   affiliation or contact with any known member of any street

DBJ7ROPS

gang.  Now, I don't care if somebody was your best friend from kindergarten, or is your cousin, or is someone that you have some other reason in the world beside gang affiliation to love. You can't see that person.  You can't talk to that person.  You can't be in touch with that person.  You can't do it unless -- and I don't imagine it's going to happen -- but unless there is something about your cooperation with the government that will require you.

Your probation officer has to know where you live all the time, and your probation officer has to know where you work all the time.  And if you are going to change either one of those things, you have to tell the probation officer ten days in advance, because the probation officer, among other things, for the next five years has the power to say, no, you can't move to that apartment because maybe the probation officer doesn't think it's a suitable place; maybe there are lots of gang members who are living around there, and the probation officer wouldn't want you around there.  That's the kind of control the probation officer will have over your life, and you have to accept that.

If there is an emergency and you are required to leave the premises where you work, or the premises where you live, if there is a gas leak or a fire, or you can't stay in your apartment, you have to notify your probation officer.  Within 48 hours you have to call the probation officer.

DBJ7ROPS

1        You have to submit your person, your residence, your

2   place of business, your vehicle, or any other premises that are

3   under your control, to a search without a warrant if your

4   probation officer has a reasonable belief that contraband or

5   evidence of a violation of the conditions of your release may

6   be found.  That search must be conducted at a reasonable time

7   and in a reasonable manner, and if you fail to submit to such a

8   search, it will be grounds for revoking your supervised release

9   and sending you back to jail.  You need to inform people that

10  you are living with that the premises may be subject to search

11  pursuant to this condition.

12       Certainly until the $700 special assessment is paid,

13  you have to provide the probation officer with access to any

14  financial information that's requested.  The government is

15  jumping up.

16       MR. BAUER:  I was waiting my turn.  I thought you

17  were --

18       THE COURT:  I'm not done yet.  Go ahead.

19       MR. BAUER:  I think it's relevant to the terms for his

20  supervised release.  It has to do with orders of protection

21  with regards to Mr. Roper.  They are listed on page 17 of the

22  PSR.  So I guess I do have a factual objection that I didn't

23  mention earlier, which is the orders of protection related to

24  his family members, his mother Deborah Clayton, Anthony Clayton

25  and Anthony Roper.  I have been told by a Yonkers police

DBJ7ROPS

1    detective who spoke with a assistant district attorneys in

2    Westchester County, that those have been lifted and removed.  I

3    am sorry that I don't have firsthand knowledge of that, but at

4    a minimum I wanted to put that on the record.

5              More importantly, your Honor --

6              THE COURT:  Ms. Caristillo --

7              MR. BAUER:  -- has not been removed, and that is the

8    mother of his child.

9              THE COURT:  Right.

10             MR. BAUER:  So, I wanted to front that, because that

11   could be an issue for his release.

12             THE COURT:  Well, as far as I'm concerned he has to

13   comply with any order of protection that's out there.

14             MR. BAUER:  I agree, your Honor.

15             THE COURT:  So, if there is an order of protection in

16   favor of Ms. Caristillo, don't you go anywhere near that lady.

17   Obviously arrangements have been made for you to see your

18   son -- or so I'm told -- while you were in jail.  Those

19   arrangements are going to have to continue.  You go near

20   Ms. Caristillo while there is an order of protection on you,

21   you are toast.  I will have you back in jail so fast your head

22   will spin.  And I mean it.

23             THE DEFENDANT:  Can I say something, your Honor?

24             THE COURT:  Say anything you like.

25             THE DEFENDANT:  I don't want to go near her, but you

DBJ7ROPS

1   know being that I'm getting my freedom back, I don't want

2   anything to do with her, this is my only fear right here.   This

3   lady right here is my only fear.   I'm not going to lie to you.

4   As you can see, we have multiple arrests because of her, and

5   probably I'm not going to lie, like probably two of them was

6   actual like, was right, but like the rest of them was false.

7   Q.   Well, here is the way we avoid the problem.   When you see

8   your son, it's going to have to be arranged by other people,

9   other people are going to have to pick him up, other people are

10   going to have to take him back.   It's really, really important

11   that you not have any contact with her.   It's really important,

12   critically important.

13          Now, if she is the kind of person who tries to have

14   contact with you, here is what I say.   If she calls you, hang

15   up, don't talk to her.   Hang up.   If she sends you an e-mail,

16   tell your probation officer and change your e-mail address.

17   Tell your probation officer.

18          You know what, your probation officer is your first

19   line of defense.   For the next five years you actually have a

20   line of defense.   If she starts to bother you, tell your

21   probation officer right away.   Say I have a problem, she is

22   reaching out to me, I don't want this, and then do what your

23   probation officer advises.

24

25          I can't think of a better piece of advice to give you,

DBJ7ROPS

but it's very, very, very important that you not have contact
with this lady, because I don't know whether what she said when
you were arrested was true or was false.  I don't know; I'm not
judging.  But if you are correct, and she is out to get you,
you can do yourself no favors by trying to deal with her.
And if you get arrested on some kind of violation of an order
of protection, I don't care what they do in the Westchester
County court, or in the Westchester family court, you are not
going home from this court.  So, stay away from the lady.

            I note that the last order of protection was renewed a
year ago, and it's going to expire on January the 18th.  The
probation office needs to know whether that order of protection
gets renewed.
            OK.  It is a special condition of your supervision
that you continue your cooperation with the government, if, as
and when required.
            You are to report to the nearest probation office
within 72 hours from your release of custody, and I recommend
that you be supervised in your district of residence.
            There is no forfeiture here, is there?
            MR. BAUER:  No, your Honor.
            THE COURT:  OK.  Now, this is pursuant to a
cooperation agreement?
            MR. BAUER:  It is, your Honor.

DBJ7ROPS

1          THE COURT:  So, is there an appeal waiver?

2          MR. BAUER:  There is no specific appeal waiver in the

3     cooperation agreement.

4          THE COURT:  Correct, OK.

5          So, Mr. Roper, you have a right to take an appeal from

6     the sentence I have imposed upon you.  You have a right to

7     counsel in connection with any appeal that you would choose to

8     file.  And if you cannot afford a lawyer, one will be appointed

9     to represent you.  Do you understand?

10          THE DEFENDANT:  Yes.

11          THE COURT:  The first temptation you are going to have

12     to overcome is the temptation to celebrate.  Don't.  Have a

13     cupcake.

14          Mr. Neuman, anything else?

15          MR. NEUMAN:  No, your Honor.

16          THE COURT:  You really don't want to see me again, Mr.

17     Roper, except possibly at Nordstrom's.  You don't want to see

18     me again, because I mean what I say, I mean business.  I am a

19     zero tolerance judge.  Don't tempt fate.

20          Anything else from the government?

21          MR. BAUER:  Judge, the defendant pled to a superseding

22     information.  The government would move to dismiss the counts

23     in the underlying indictment.

24          THE COURT:  The underlying indictment is dismissed.

25          MR. BAUER:  Thank you, your Honor.

DBJ7ROPS

1              THE COURT:  Good luck, sir.

2              MR. NEUMAN:  Thank you, your Honor.

3              THE COURT:  I hope I never see you again.  These

4    proceedings are closed.

5                                        *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25